IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| KORTNEY MCGEE,<br><br>                    Plaintiff,<br><br>vs.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of the Social Security<br>Administration,<br><br>                    Defendant. | CV 16-39-BLG-TJC<br><br>**ORDER** |

On April 11, 2016, Plaintiff Kortney McGee (née Roberts) ("Plaintiff") filed

a complaint pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting

judicial review of the final administrative decision of the Commissioner of Social

Security ("Commissioner") regarding the denial of Plaintiff's claim for disability

insurance benefits ("DIB") and supplemental security income ("SSI") under Titles

II and XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, 1381-

1383f.  (Doc. 1.)  The Commissioner filed an Answer on June 20, 2016 (Doc. 7),

and the Administrative Record ("A.R.") on June 21, 2016.  (Doc. 8.)

Presently before the Court is Plaintiff's motion for summary judgment,

seeking reversal of the Commissioner's denial and remand for an award of

disability benefits. (Doc. 10.) The motion is fully briefed and ripe for the Court's review. (Docs. 11, 14.)

For the reasons set forth herein, and after careful consideration of the record and the applicable law, the Court enters the following order reversing the Commissioner's decision and remanding the matter for further proceedings.

## I.    PROCEDURAL BACKGROUND

Plaintiff filed an application for DIB and SSI benefits in October 2007. (A.R. 110-117.) Plaintiff alleged she has been disabled since her birth on September 11, 1990. (A.R. 110.) The Social Security Administration denied Plaintiff's application initially on March 21, 2008, and upon reconsideration on September 10, 2008. (A.R. 63-70.) On October 8, 2008, Plaintiff filed a written request for a hearing. (A.R. 78-80.) Administrative Law Judge Louis J. Volz, III ("ALJ Volz") held a hearing on October 20, 2009 (the "2009 Hearing"). (A.R. 33-62.) On January 2, 2010, ALJ Volz issued a written decision finding Plaintiff not disabled. (A.R. 13-32.) Plaintiff requested review of the decision on March 22, 2010. (A.R. 7-8.) ALJ Volz's decision became final on July 19, 2010, when the Appeals Council denied Plaintiff's request for review. (A.R. 1-6.)

Plaintiff appealed the denial of her request for benefits to the U.S. District Court for the District of Montana, Great Falls Division on September 19, 2011.

*See McGee v. Astrue*, CV 11-63-GF-SEH.  U.S. Magistrate Judge Keith Strong

entered Findings & Recommendations on June 14, 2012, recommending to

presiding District Court Judge Sam Haddon that ALJ Volz's decision be affirmed.

*McGee*, CV 11-63-GF-SEH-RKS (D. Mont. June 14, 2012 (Doc. 21)).  Judge

Haddon adopted Judge Strong's Findings & Recommendations on July 9, 2012.

*McGee*, CV 11-63-GF-SEH (D. Mont. July 9, 2012 (Doc. 23)).  Plaintiff timely

appealed to the Ninth Circuit Court of Appeals.

 The Ninth Circuit affirmed in part and reversed in part.  *See McGee v.*

*Colvin*, 556 Fed.Appx. 616 (9th Cir. 2014).  The Ninth Circuit affirmed ALJ

Volz's step-three finding that McGee did not meet the regulatory listings for

cerebral palsy.  *Id*. at 617-618.  However, the Ninth Circuit reversed ALJ Volz's

step-five determination of Plaintiff's residual functional capacity ("RFC").  The

Ninth Circuit explained that ALJ Volz reasonably concluded that some of McGee's

testimony with respect to her symptoms was not fully credible, but found that ALJ

Volz's "broad finding that McGee did not have *any* significant non-exertional

limitations is not supported by substantial evidence and specific, clear and

convincing reasons."  *Id*. at 618 (emphasis in original) (quotations omitted).  The

Ninth Circuit provided several reasons for this conclusion.

First, while evidence in the record suggested that Plaintiff's urinary incontinence improved with the medication Vesicare, the record did not support ALJ Volz's apparent determination that Plaintiff would not require ready access to a restroom at work. *Id.* Second, while evidence in the record suggested that Plaintiff "can function well with her right upper extremity," ALJ Volz did not provide specific, clear, and convincing reasons for his conclusion that Plaintiff can perform a full range of medium work, in light of her demonstrated impairments in her right hand and arm. *Id.* Finally, the Ninth Circuit took issue with ALJ Volz's conclusion that Plaintiff does not have significant walking or standing limitations, which is in seeming contradiction with his finding that she "can walk and/or stand for 1 hour before needing to sit." *Id.* ALJ Volz failed to explain why that finding, in and of itself, is not a significant non-exertional limitation. *Id.*

The Ninth Circuit provided the following instructions on remand:

> At the administrative hearing, McGee's counsel posed a hypothetical question to the vocational expert that incorporated some of McGee's non-exertional limitations. Unfortunately, the transcript of the expert's answer is inaudible and not subject to judicial review. Therefore, we reverse the district court's order granting summary judgment and remand to the district court with instructions to remand to the Social Security Administration to make additional step-five findings, incorporating McGee's non-exertional limitations. Substantial evidence supports the finding that McGee is capable of a medium range of exertion, subject to non-exertional limitations, and substantial evidence supports the finding that McGee does not have other significant non-exertional limitations besides those reflected in the

limitations described above (length of time standing/walking, modest limitations with the right upper extremity, and urinary issues).

*Id*. at 618-619.

Administrative Law Judge Michael A. Kilroy (the "ALJ") held a second hearing on remand on August 10, 2015. (A.R. 506-565.) On October 8, 2015, the ALJ issued a written decision again finding Plaintiff not disabled. (A.R. 476-505.) Following Plaintiff's timely request for review (A.R. 458-475), the ALJ's decision became final on February 12, 2016, when the Appeals Council denied Plaintiff's request for review. (A.R. 453-457.) Thereafter, Plaintiff filed the instant action.

## II.    LEGAL STANDARDS

### A.    Scope of Review

The Social Security Act allows unsuccessful claimants to seek judicial review of the Commissioner's final agency decision. 42 U.S.C. §§ 405(g), 1383(c)(3). The scope of judicial review is limited. The Court must affirm the Commissioner's decision unless it "is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). *See also Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) ("We may reverse the ALJ's decision to deny benefits only if it is based upon legal error or is not supported by substantial evidence."); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

"Substantial evidence is more than a mere scintilla but less than a preponderance." *Tidwell*, 161 F.3d at 601 (citing *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997)). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Flaten*, 44 F.3d at 1457. In considering the record as a whole, the Court must weigh both the evidence that supports and detracts from the ALJ's conclusions. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975)). The Court must uphold the denial of benefits if the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."); *Flaten*, 44 F.3d at 1457 ("If the evidence can reasonably support either affirming or reversing the Secretary's conclusion, the court may not substitute its judgment for that of the Secretary."). However, even if the Court finds that substantial evidence supports the ALJ's conclusions, the Court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching a conclusion. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1968)).

In addition, "[d]eviation from the court's remand order in the subsequent administrative proceedings is itself legal error, subject to reversal on further judicial review." *Sullivan v. Hudson*, 490 U.S. 877, 886 (1989). Given the nature of the current review, it is also important to note that "[c]ourts reviewing Social Security cases after a limited remand have refused to re-examine issues settled by a district court's prior order." *Nolte v. Astrue*, 2012 WL 4466558, *2 (D. Ariz. Sept. 27, 2012) (citing *Hulsey v. Astrue*, 622 F.3d 917, 925 (8th Cir. 2010) (law of the case doctrine applies to administrative agencies on remand, including Social Security proceedings)); *Ischay v. Barnhart*, 383 F.Supp.2d 1199. 1216 (C.D. Cal. 2005) ("the doctrine of the law of the case and the rule of mandate apply to matters remanded to the Agency for further proceedings")).

## B.    Determination of Disability

### 1.    Childhood Disability

An individual under the age of eighteen (18) is disabled if she has a medically determinable physical or mental impairment resulting in marked and severe functional limitations. 42 U.S.C. § 1382c(a)(3)(C)(i). The following evaluation determines if a child's impairments cause marked and severe limitations:

> (1)  If the child is doing substantial gainful activity, the child is not disabled;

(2)  If the child's physical or mental impairment is not severe, the child is not disabled;

(3)  If the child's physical or mental impairment is severe, it is reviewed to see if it meets or medically equals the listings and the duration requirements.  If the impairment meets both the listing and duration requirements, the child is disabled.

20 C.F.R. § 416.924(a).

A limitation is "marked" if it interferes seriously with the child's ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(2). A limitation is "extreme" if it very seriously interferes with the child's ability to independently initiate, sustain, or complete activities, although it does not require a total lack of ability to function.  20 C.F.R. § 416.926a(e)(3).  A child's impairment functionally equals a listing if she has marked limitations in two domains or an extreme limitation in one domain.  20 C.F.R. § 416.926a(d).

The Commissioner considers the following areas in determining whether a child's impairments functionally equal the listings: acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, self-care, and health and physical wellbeing.  20 C.F.R. § 416.926a(b)(1).

/ / /

/ / /

## 2. Adult Disability

To qualify for disability benefits under the Social Security Act, an adult claimant must show two things: (1) she suffers from a medically determinable physical or mental impairment that can be expected to last for a continuous period of twelve months or more, or would result in death; and (2) the impairment renders the claimant incapable of performing the work she previously performed, or any other substantial gainful employment which exists in the national economy. 42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A). A claimant must meet both requirements to be classified as disabled. *Id.*

The Commissioner makes the assessment of adult disability through a five-step sequential evaluation process. If an applicant is found to be "disabled" or "not disabled" at any step, there is no need to proceed further. *Ukolov v. Barnhart*, 420 F.3d 1002, 1003 (9th Cir. 2005) (quoting *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 974 (9th Cir. 2000)). The five steps are:

1. Is claimant presently working in a substantially gainful activity? If so, then the claimant is not disabled within the meaning of the Social Security Act. If not, proceed to step two. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2. Is the claimant's impairment severe? If so, proceed to step three. If not, then the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3. Does the impairment "meet or equal" one of a list of specific impairments described in 20 C.F.R. Part 220, Appendix 1? If so, then the claimant is disabled. If not, proceed to step four. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled. If not, proceed to step five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5. Is the claimant able to do any other work? If so, then the claimant is not disabled. If not, then the claimant is disabled. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

Although the ALJ must assist the claimant in developing a record, the claimant bears the burden of proof during the first four steps, while the Commissioner bears the burden of proof at the fifth step. *Tackett v. Apfel*, 180 F.3d 1094, 1098, n.3 (citing 20 C.F.R. § 404.1512(d)). At step five, the Commissioner must "show that the claimant can perform some other work that exists in 'significant numbers' in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Id*. at 1100 (quoting 20 C.F.R. § 404.1560(b)(3)).

/ / /

/ / /

## III.   FACTUAL BACKGROUND[1]

Plaintiff claims to suffer from the severe childhood impairment of cerebral palsy, and the severe adult impairments of cerebral palsy and depression.  She asserts that these impairments render her incapable of performing substantial gainful employment.

### A.   The Hearing

A hearing was held before the ALJ on August 10, 2015, in Billings, Montana, and the following testimony was provided.

#### 1.   Plaintiff's Testimony

Plaintiff testified that she lives in a multiple-level house in Billings with her husband and three dogs.  (A.R. 513-514.)  She spends most of her time on the lower level of her house, and estimates that she goes upstairs three or four times per week.  (A.R. 514.)

She graduated high school, and has completed one semester of college. (A.R. 514.)  She knows how to use a computer and has used computers in a work setting, but she has no formal job training.  (A.R. 515.)

---

[1] These Findings and Recommendations focus on the factual record developed upon remand.  The parties should refer to Judge Strong's June 14, 2012, Findings & Recommendations for a more complete account of the factual background developed prior to remand.  *See McGee*, CV 11-63-GF-SEH-RKS (D. Mont. June 14, 2012 (Doc. 21)).

Plaintiff has worked in the time since the 2009 Hearing.  (A.R. 516.)  She worked part-time as a preschool assistant teacher from March 2010 to September 2010.  She was a "fill-in assistant," and her hours ranged from four or five per week up to fifteen.  (A.R. 517.)  Her duties included printing papers, monitoring the students, assisting with drop-off and pick-up, and assisting the teachers with the classroom.  (A.R. 517.)  She and the other teachers were jointly responsible for the children.  (A.R. 517.)

Plaintiff also worked for four months as a receptionist at an optometric clinic.  (A.R. 517-518.)  That position originally was full-time, but Plaintiff's health issues forced her to cut back on hours toward the end of her tenure.  (A.R. 518.)  She estimates that three-fourths of her time there was spent sitting, with the other time spent standing.  (A.R. 518.)  Her duties included scheduling appointments and checking in patients.  (A.R. 518.)

As of the time of the hearing, Plaintiff was working "as a very part-time nanny," supervising two children, ages three and four, on a ranch.  (A.R. 519-520.)  She was working one day per week, four to five hours per day.  (A.R. 519.)  She described the position as a mix of sitting and walking, but indicated that there is a room where she can lay down and stretch if needed.  (A.R. 519.)  Her duties included supervising and entertaining the children.  (A.R. 519-520.)  The

children's mother was present at all times, but she employed Plaintiff so she could direct her attention to the ranch financial books.  (A.R. 520.)  When asked by the ALJ if she could perform this job more days per week or for more hours, Plaintiff answered that she "could potentially do one more day or a few more hours here and there, but not on a consistent basis."  (A.R. 521.)

Plaintiff testified that the condition of her right arm is "about the same" as it was at the 2009 Hearing.  She testified that she "cannot lift things or open [her] hand most of the time."  (A.R. 522.)  She reports that the muscles are "very spastic on that side" and is "constantly held tight," such that she has limited usage of her fingers on her right hand.  (A.R. 522.)  She reports that she "can't count on" her right arm, noting that she may drop things she is carrying with that arm.  (A.R. 522-523.)  She sometimes has to pry her fingers open to get the muscles to relax, which happens numerous times throughout the day.  (A.R. 523-524.)  When her hand is in that contracted position, she cannot use it to type on a computer or do other fine motor tasks.  (A.R. 523-524.)  Her hand is generally relaxed when she wakes up in the morning, but begins to contract when she starts tasks such as getting dressed, brushing her teeth, and doing her hair, and continues contracting throughout the day.  (A.R. 524.)  After she pries her fingers open, she must place her palm flat on a table to force her hand to relax; depending on the severity of the

contraction, this can take as long as 15 minutes.  (A.R. 524-525.)  She takes pain

medication and muscle relaxers to help with spasticity.  (A.R. 525.)

Plaintiff reports problems with her right leg, including a "hip issue," a

bunion resulting from her altered gait, and a weak ankle.  (A.R. 526.)  She believes

the pain resulting from these issues is more frequent than it was at the 2009

Hearing.  (A.R. 526.)  She reports that the pain is sometimes so severe that she

cannot walk; that happens "a few times a month" if she is not working regularly,

but is more frequent if she is working.  (A.R. 526.)  She reports that "if [she has] a

day or two if [she's] working, then a lot of times the next three, four days [she

spends] laid up."  (A.R. 526.)  She undergoes massage therapy and physical

therapy to help with the leg pain.  (A.R. 527-528.)  Plaintiff had medial patella

ligament reconstructive surgery on her left knee in 2011, which resulted in

progressively worsening pain in her right hip.  (A.R. 529-530.)

Plaintiff also complains of urinary incontinence.  (A.R. 530.)  Compared to

the 2009 Hearing, she reports that this issue is "better in some ways, about the

same in other[s]."  (A.R. 530.)  She elaborates that the issue is better with respect

to the frequency and urgency of her urination, which improved following the

insertion of an "InterStim" into her bladder in 2011.  (A.R. 530.)  The condition is

the same, however, with respect to losing control of her bladder when she coughs,

laughs, or sneezes, and being unable to control her bladder if she does not get to a bathroom quickly enough. (A.R. 530.) She reports that she urinates on average every half hour to hour and a half. (A.R. 531.) She reports that she urinates in her pants "on average, at least once a day," although not every instance is substantial enough to require her to change clothes. But she reports that she has a complete loss of control necessitating a clothing change two to three times per week. (A.R. 531.) She states that she gets up four to five times per night to urinate. (A.R. 532.)

Next, Plaintiff reports that a psychologist or psychiatrist diagnosed her in 2012 or 2013 with bipolar disorder, severe depression, post-traumatic stress disorder ("PTSD") and insomnia.[2] (A.R. 532.) Plaintiff stated that she was taking Cymbalta for depression at the time of the hearing. (A.R. 533-534.) When asked whether her mental health issues would prevent her from working if all of her physical symptoms could be managed, Plaintiff responded that she would still have trouble working due to insomnia, irritability, and trouble concentrating. (A.R. 535-536.) She reports that she had to leave work from her nanny job four or five times due to an inability to concentrate. (A.R. 537-538.)

_____

[2] Plaintiff's attorney indicated at the hearing that he does not have any psychiatric records from the time period during which Plaintiff alleges to have been diagnosed with the stated mental health impairments. (A.R. 533.)

Plaintiff testified that she has been diagnosed with postural orthostatic tachycardia syndrome, which causes her pulse to quicken when sitting or standing. (A.R. 539.)  This in turn causes her to become dizzy, and forces her to lay down for 15-20 minutes.  (A.R. 539-540.)  She also reports polycystic ovarian syndrome, which causes cysts on her ovaries and results in pain, especially during her menstrual periods.  (A.R. 540-542.)

Plaintiff testified that she can probably walk for a half hour at a time without stopping, assuming she has an opportunity to stretch during the half hour.  (A.R. 546.)  She believes she can stand for 20 minutes before sitting down, on a good day.  (A.R. 546-547.)  She can sit for an hour to an hour and a half.  (A.R. 547.)  She estimates she can carry 10-15 pounds.  (A.R. 548.)

Plaintiff states that she leaves her house five times per week.  (A.R. 549.)  With respect to household chores, she does dishes sometimes, cooks sometimes, puts away groceries, and starts laundry.  She does not sweep, mop, vacuum, or carry laundry.  (A.R. 550.)

The ALJ asked Plaintiff to describe a normal day for her.  (A.R. 551.)  She specified that she would be describing a "good day."  Assuming no early appointments, Plaintiff gets up between 10:00 a.m. and 10:30 a.m.  She then gets

dressed, goes downstairs,[3] lets the dogs outside, and makes breakfast.  (A.R. 551.)

Once her pain medications takes effect, she unloads the dishwasher and might pay

bills.  Interspersed among these activities are periods of laying down and resting.

(A.R. 551.)  In the evenings, she lets the dogs out, eats dinner with her husband,

and goes upstairs to bed around 7:00 p.m., "in hopes that [she] can fall asleep and

have a good night of sleep."  (A.R. 551-552.)  For hobbies, Plaintiff enjoys

reading, watching television, and using the computer.  (A.R. 552-553.)

Plaintiff has a service animal who retrieves medication, and alerts when

Plaintiff has seizures.  (A.R. 554.)  She estimates that she had two or three seizures

in the calendar year leading up to the hearing.  (A.R. 555.)  These are petit mal

seizures that cause Plaintiff to fall down, sometimes without warning.  (A.R. 555.)

She has not been advised to stop driving due to her seizures.  (A.R. 557.)

### 2.    Vocational Expert's Testimony

Matthew Sprong, a Vocational Expert (the "VE"), also testified before the

ALJ.  (A.R. 558-564.)  The ALJ asked the VE three hypothetical questions.  First,

the ALJ asked the VE to make the following assumptions: a newly arrived adult;

high school diploma and some college, but did not complete a program of study; a

---

[3] Plaintiff's testimony on this point seems inconsistent with her earlier testimony
that she only goes upstairs three or four times per week.  (*See* A.R. 514.)  No
further testimony addresses this apparent discrepancy.

little bit of computer use in the work setting primarily to schedule appointments; the abilities to walk a quarter mile at a time, stand for half an hour at a time, be on one's feet at least four hours in an eight-hour day, sit for an hour and a half at a time with breaks, and work in a seated position for eight hours; the abilities to lift 15 to 20 pounds occasionally, and 10 pounds or less frequently; never crawling or climbing ladders or scaffolding, but performing all other postural activities frequently; avoiding concentrated exposure to extreme cold, and avoiding hazards such as unprotected heights or dangerous machinery; for the non-dominant right upper extremity, seldom performing fine motor tasks, occasionally being able to hold a larger object such as a fork or knife, and occasionally being able to perform gross motor tasks, but never any repetitious use; and no limitations beyond the lifting mentioned above with respect to the left upper extremity. The VE said the individual would be able to perform the jobs of cashier II, ticket taker, and conveyor line bakery worker. (A.R. 559-561.)

Second, the ALJ asked the VE to assume the same person, but with the additional limitations of walking four or five blocks at a time; no more than 20 minutes on one's feet at a time, and no more than two hours in an eight-hour day; lifting 10 to 15 pounds occasionally, and less than 10 pounds frequently; and still never crawling or climbing ladders or scaffolding, but performing all other postural

activities occasionally.  The VE said the individual would be able to perform the jobs of call-out operator and surveillance system monitor.  (A.R. 561-562.)

Third, the ALJ asked the VE to assume the same person as hypotheticals one and two, but with the added limitation that the person would need ten minutes or more added onto any or all breaks on at least an occasional basis, and/or the person would miss more than two workdays in a typical work month on at least an occasional basis.  The VE said there are no jobs that would fit that description.  (A.R. 562-563.)

Finally, the ALJ asked the VE if the number of jobs Plaintiff could perform would lessen if she could perform no greater than medium work.  The VE said the number of jobs would lessen, but there is no indication that the jobs he indicated she could perform would be eliminated.  (A.R. 563.)  The ALJ also asked how Plaintiff's seizures would affect her job potential.  The VE responded that "one seizure would preclude employment from what I've seen."  (A.R. 564.)

### B.     Medical Evidence

The A.R. also includes the following pertinent medical records.  Additional records may be discussed below as appropriate.

//

//

### 1. Treating Physician Evidence

#### a. Patrick J. Thomas, MD

Dr. Thomas is an orthopedic surgeon who operated on Plaintiff's left knee in April of 2011. (A.R. 1051.) Dr. Thomas noted that Plaintiff "underwent left knee surgery with patellar realignment, tibial tubercle osteotomy in November 2007." (A.R. 1051.) Dr. Thomas removed the tibial tubercle hardware and noted some improvement from that, but indicated that Plaintiff "still has had considerable problems with instability despite her surgical treatment." (A.R. 447-448, 1051.)

On April 13, 2011, Dr. Thomas performed a left knee medial patellofemoral ligament reconstruction with autologous hamstring tendons. (A.R. 436-438.) Dr. Thomas noted that Plaintiff tolerated the procedure well, and that there were no complications. (A.R. 438.) Dr. Thomas' post-operative notes indicated that Plaintiff was progressing well, other than a mild infection that cleared with antibiotics. (A.R. 439-441.) On June 9, 2011, Dr. Thomas noted that Plaintiff had "achieved full extension with flexion to 135 on the knee" and is "quite pleased with her outcome at this time." (A.R. 442.) He noted in his final follow-up report that her knee is "functioning well at this time," and that she "is ambulating without a limp on the left extremity." (A.R. 444.)

**b.     Rollin W. Bearss, MD**

Dr. Bearss is a urologist who treated Plaintiff on a number of occasions from March 23, 2011, through June 5, 2013.  (A.R. 775-790, 962-997.)  Dr. Bearss noted upon his first treatment of Plaintiff that she was referred to him for evaluation and management of urinary incontinence, and specifically "to determine whether or not she is a reasonable candidate for pelvic floor neuromodulation." (A.R. 782.)  He noted Plaintiff's past treatments for urinary incontinence, including "prior urodynamic testing," "some type of pubovaginal sling in 2006," various medications, and catheterization.  (A.R. 782.)  Dr. Bearss recorded Plaintiff's then-existing symptoms of nocturia 4 to 8 times per night, daytime voiding intervals between 30 minutes and 4 hours, leaking urine with laughter, and "hav[ing] to think about relaxing in order to facilitate micturition."  (A.R. 782.)

On June 17, 2011, Dr. Bearss operated on Plaintiff to remove the pubovaginal sling.  (A.R. 977-978.)  Plaintiff reported thereafter that it was easier to urinate.  (A.R. 983.)  She was still reporting "urgency and frequency with mixed incontinence" on August 4, 2011, although Dr. Bearss' notes indicate "she understood going into the procedure" that those symptoms would be present after the surgery.  (A.R. 984.)  Plaintiff also indicated that medication was helping.  (*Id.*)

On September 28, 2011, Dr. Bearss implanted an InterStim pelvic floor

neuromodulator.  (A.R. 969-970, 990.)  Plaintiff reported on October 5, 2011, that voiding intervals had increased to 1.5 to 2.5 hours, that she does not have to push to void, that she can increase her fluid intake without worrying about urgency/frequency, and that her voiding stream is stronger and less intermittent. Dr. Bearss noted that Plaintiff "is very pleased with the results."  (A.R. 990.) Plaintiff reported "90% improvement" on October 5, 2011, and "excellent control of her symptoms of urinary urgency, frequency, along with improvement in the size and force of her urinary stream" on October 10, 2011.

Plaintiff saw Dr. Bearss again on May 16, 2012, complaining of "urinary urgency, frequency, dysuria with increasing frequency that has gotten worse over the past week."  (A.R. 997.)  Dr. Bearrs reprogrammed Plaintiff's InterStim on June 4, 2012, in effort to alleviate the symptoms.  Finally, on June 5, 2013, Dr. Bearss reprogrammed Plaintiff's InterStim again, and instructed Plaintiff how to reprogram the device at home.

### c.        Jessica D. Cozzens, MD

Dr. Cozzens became Plaintiff's primary care physician beginning July 12, 2013, following Plaintiff's relocation from Havre, MT to Billings, MT.  Dr. Cozzens' initial note documents Plaintiff's chronic issues of cerebral palsy with neurogenic bladder, which is controlled "very well" by the InterStim device; a

history of migraines with increasing frequency; a history of seizures, but that Plaintiff "does not feel that this is an issue anymore" since taking Ambien; a history of irritable bowel syndrome, alternating between constipation and diarrhea; and chronic pain related to her cerebral palsy.  (A.R. 928.)

On April 28, 2014, Dr. Cozzens treated Plaintiff for symptoms related to a motor vehicle accident ("MVA") the preceding day.  (A.R. 841.)  Dr. Cozzens suspected a whiplash injury to Plaintiff's neck.  (A.R. 844.)  Dr. Cozzens noted that x-rays of Plaintiff's cervical and thoracic spine taken immediately following the MVA were both negative.  (A.R. 841.)  Plaintiff returned to Dr. Cozzens on May 8, 2014, continuing to complain of neck stiffness and a headache.  (A.R. 833.) Dr. Cozzens gave Plaintiff a Toradol injection for pain and referred her to physical therapy for treatment of her whiplash symptoms.  (A.R. 835.)  Dr. Cozzens saw Plaintiff again on May 19, 2014, to treat the whiplash symptoms.  (A.R. 826.)  Dr. Cozzens gave Plaintiff a trigger point injection, and Plaintiff reported immediate relief.  (A.R. 828.)  Dr. Cozzens also noted that Plaintiff was "doing quite well" with her chronic pain since changing medications from morphine to OxyContin. (A.R. 826.)

//

//

### 2. Treating Other Source Evidence

#### a. Joy Newcomer

Newcomer is a social worker who completed a questionnaire on March 17, 2009, indicating that Plaintiff's "probability of returning to employment [is] unlikely at this point." (A.R. 382.) Newcomer identified Plaintiff's work level to be "severely limited," meaning "unable to lift at least 2 pounds or unable to stand and/or walk." (A.R. 381.)

#### b. Robin Smith, PT

Smith is a physical therapist who treated Plaintiff initially on May 28, 2014. (A.R. 952.) Smith documented Plaintiff as having a "Neck Disability Score of 28/50 indicating severe disability with regard to neck related pain." (A.R. 953.) Smith assessed Plaintiff as having the following impairments: a decreased cervical range of motion ("ROM") bilaterally and a decreased ROM of her left upper extremity; decreased strength of left upper extremity with onset of pain; soft tissue hypertonicity throughout neck and shoulder area; cervicogenic headaches affecting her ability to perform daily tasks including, *inter alia*, working as a nanny; and difficulty turning her head left and right, and reaching overhead. (A.R. 954-955.) Smith noted, however, that Plaintiff "should respond well to physical therapy." (A.R. 955.)

Smith's record dated July 21, 2014, indicates that Plaintiff had eight physical therapy appointments from May 28, 2014, through July 18, 2014.  (A.R. 956.)  Plaintiff reported on July 18 that "she was experiencing a dramatic increase in neck pain with headaches with new tingling into the right shoulder and hand."  (A.R. 956.)  Smith put cervical treatments on hold while awaiting the results of a July 28, 2014, CT scan (which ultimately was negative (*see* A.R. 821)).

### c.      Karen Stainton, FNP

Stainton is a family nurse practitioner who diagnosed Plaintiff on July 30, 2014, with chronic neck pain related to the MVA that does not seem to be improving.  (A.R. 819.)  She also prescribed Cymbalta to treat Plaintiff for depression.  (A.R. 819-820.)

### d.      Larry G. Scharfe, PA-C

Scharfe is a certified physician assistant who treated Plaintiff on August 19, 2014, for further neck pain and headaches related to the MVA.  (A.R. 807.)  Scharfe noted with respect to Plaintiff's gait and station that she was dragging her right foot but that her stride is normal.  (A.R. 813.)  Scharfe recommended that Plaintiff continue taking Cymbalta as long as it remains tolerable, and that "certainly physical therapy, massage therapy, trigger point injections and medications are the way to treat this [myofascial pain post MVA]."  (A.R. 814.)

## C.     The ALJ's Findings

The ALJ followed the five-step sequential evaluation process in considering

Plaintiff's claim.  First, the ALJ found that Plaintiff had not engaged in substantial

gainful activity since the date her application was filed.  (A.R. 484.)  At that point,

the ALJ separated Plaintiff's evaluation between childhood and adulthood.

The ALJ found that Plaintiff had the severe impairments of "cerebral palsy

causing hemiplegia on the right, leg discrepancy, and urinary urgency" prior to her

eighteenth birthday.  (A.R. 484.)  Next, he found that she did not have an

impairment or combination of impairments that met or medically equaled a listed

impairment, nor did she have an impairment or combination of impairments that

functionally equaled a listing.  (A.R. 485.)  Accordingly, the ALJ found that

Plaintiff was not disabled prior to adulthood.  (A.R. 492.)

The ALJ next found that Plaintiff had also developed the additional severe

impairments of whiplash syndrome and dysfunction of the left knee once attaining

adulthood.  (A.R. 492.)  However, he found that she does not have an impairment

or combination of impairments that meets or medically equals a listed impairment.

(A.R. 494.)  The ALJ stated that, since attaining age 18, Plaintiff has the RFC to:

> perform light work as defined in 20 CFR 416.967(b) except she can
> walk 1/4 mile at a time; can stand for 30 minutes at a time; can be on
> her feet for a total of 4 hours in an 8-hour day; can sit for an hour and a
> half at a time with breaks (either for several minutes mid-shift or a

simple break to stand and stretch, and walk before returning to sitting) and with these breaks a [sic] can also work for 8 hours in a seated position. The claimant can lift 15-20 pounds on an occasional basis and 10 pounds of less on a frequent basis; can never crawl or climb on ladders and scaffolding but can perform all other postural activity on a frequent basis; must avoid concentrated exposure to extreme cold and hazards such as unprotected heights or open, dangerous machinery; with non-dominant right hand can seldom pick up small objects (e.g., pins, needles, coins) but can pick up and hold larger objects occasionally. The claimant can perform gross motor movements only occasionally and can perform no repetitious activity with her right upper extremity.

(A.R. 494.)

The ALJ next found that Plaintiff has no past relevant work. (A.R. 497.) He found that the claimant is a "younger individual age 18-44" and has at least a high school education and is able to communicate in English. (A.R. 497.) The ALJ found that Plaintiff has the RFC to perform jobs that exist in significant numbers in the national economy, including Cashier II[4], Ticket-taker, and Conveyor line bakery worker. (A.R. 498.) Thus, the ALJ found that Plaintiff is not disabled. (A.R. 498.)

//

---

[4] The ALJ's decision lists "Janitor II" as one of the jobs Plaintiff can perform. That is not what the VE discussed at the hearing. Rather, the VE opined that Plaintiff could perform the job of "Cashier II." The Court assumes this is a mistake by the ALJ because the DOT code number he cites for Janitor II is the same one the VE provided for Cashier II. (*See* A.R. at 498, 561.)

## IV.   DISCUSSION

The Court had some difficulty identifying the issues the Plaintiff has presented for review, since her individual arguments are not well delineated in her brief.  (*See* Doc. 10 at 15-27.)  The Court has liberally construed Plaintiff's Opening Brief to discern assertions that the ALJ erred in the following ways: (A) failing to comply with the remand order; (B) failing to credit properly Plaintiff's testimony; (C) concluding that Plaintiff can perform light work activities; (D) concluding that Plaintiff's impairments do not meet the criteria for a listing of impairments; (E) rejecting the findings of Plaintiff's treating physicians; and (F) concluding that jobs exist in the national economy that Plaintiff can perform.

### A.   The ALJ's Compliance with the Remand Order

As explained above, the Ninth Circuit remanded the case with orders that the ALJ present more specific evidence with respect to (1) Plaintiff's urinary incontinence, (2) Plaintiff's ability to perform medium work given the limitations with her right hand and arm, and (3) Plaintiff's inability to walk or stand for more than an hour at a time.  The Court will discuss orders (2) and (3) first.

Regarding, remand order (2), the Ninth Circuit wrote:

Second, while the record supports a finding that McGee can function well with her right upper extremity, it does not support the broader conclusion that McGee has no significant limitations with her right hand and arm.  In addition, the medical record contradicts the ALJ's

> statement that there was an absence of "upper extremity complaints or findings on examination subsequent to December 2007 when she was found 'extremely functional' with the use of her right upper extremity." For example, a December 2008 medical progress record noted that McGee complained of "pain in her right wrist and hand," and a March 2009 medical record indicated that she had "some right upper extremity weakness." Therefore, the ALJ did not provide a specific, clear and convincing reason why McGee could perform "a full range of 'medium' work," including work that might involve extensive gripping, pulling and pushing, or fine movements with both hands and arms.

(A.R. at 613-614.)

The Court finds that the ALJ complied with this order. First, the ALJ reduced Plaintiff's RFC from medium work to light work, thereby lessening the level of physicality required to perform work tasks. (A.R. at 494.) Additionally, the ALJ included limitations in Plaintiff's RFC to address the deficiencies with her right arm, such as "with non-dominant hand can seldom pick up small objects (e.g., pins, needles, coins) but can pick up and hold larger objects occasionally," and "[t]he claimant can perform gross motor movements only occasionally and can perform no repetitive activity with her right upper extremity." (A.R. 494) Accordingly, the ALJ accounted for Plaintiff's significant limitations with her right hand and arm, thereby complying with the Ninth Circuit's remand order.

Regarding remand order (3), the Ninth Circuit wrote:

> Finally, the ALJ found that McGee "can walk and/or stand for 1 hour before needing to sit" and concluded that she did not have significant walking or standing limitations. But the ALJ did not explain why the

> inability to walk or stand for more than an hour at a time is not itself a significant non-exertional limitation. *See Tackett v. Apfel*, 180 F.3d 1094, 1103 (9th. Cir. 1999) (claimant's need to shift positions every half hour was significant non-exertional limitation).

(A.R. 614.)

The Court finds that the ALJ also complied with this order. As mentioned above, the ALJ reduced Plaintiff's RFC to light work, which lessens the impact of Plaintiff's walking and standing limitations. Additionally, the ALJ discussed Plaintiff's limitations with walking and standing and factored those limitations into Plaintiff's RFC, thereby rectifying the mistaken conclusion that Plaintiff "did not have significant walking or standing limitations." Accordingly, the ALJ accounted for Plaintiff's significant limitations with walking and standing, thereby complying with the Ninth Circuit's remand order.

The Court reaches a different conclusion with respect to remand order (1), dealing with Plaintiff's urinary incontinence. The Ninth Circuit wrote:

> First, the fact that McGee's symptoms of urinary incontinence "improved" with the medication Vesicare does not show that McGee's urinary issues were fully controlled, such that she might not have the limitation of needing ready access to a restroom at work.

(A.R. 613.)

The ALJ discussed the effects of Plaintiff's urinary incontinence in a lengthy paragraph, concluding, "[the urinary incontinence] impairment is accounted for in

the [RFC] stated above by restrictions allowing for breaks (on a normal break schedule, or mid-shift) which would allow the claimant to access a restroom." (A.R. 495.) The ALJ discussed breaks only briefly in the RFC, writing, "[Plaintiff] can sit for an hour and a half at a time with breaks (either for several minutes mid-shift or a simple break to stand and stretch, and walk before returning to sitting) and with these breaks a [sic] can also work for 8 hours in a seated position." (A.R. 494.)

There are two main problems with the ALJ's treatment of Plaintiff's incontinence. First, there is nothing in the RFC that would allow for ready access to a restroom, as the Ninth Circuit required the ALJ to consider. The ALJ does conclude that "[the urinary incontinence] impairment is accounted for in the [RFC] stated above by restrictions allowing for breaks (on a normal break schedule, or mid-shift) which would allow the claimant to access a restroom." (A.R. 495.) But that conclusion raises the second problem, which is that the ALJ does not define what is meant by "a normal break schedule" or "mid-shift." If it means Plaintiff would be allowed only regularly scheduled breaks at designated times, then the RFC does not account for Plaintiff's documented issues with urinary urgency or comply with the Ninth Circuit's order to consider whether Plaintiff needs "ready access to a restroom." Such a schedule would not allow Plaintiff to take breaks

whenever necessary to attend to her "at least daily" episodes of incontinence, or to permit her time to change her clothes multiple times per week as a result of incontinence. If, on the other hand, the ALJ means that Plaintiff is allowed to take breaks as often and whenever she needs, that then the ALJ's decision is more likely to comply with the Ninth Circuit's remand order. But this is unclear from the ALJ's decision.

"Material ambiguities and inconsistencies in an ALJ's decision generally warrant remand." *Bridges v. Colvin*, 2104 WL 1370369, *3 (C.D. Cal. April 8, 2014) (citations omitted). This is clearly a material ambiguity, since the VE testified that there would be no jobs available with the additional limitation that the "individual would need breaks so they exceed the two 15-minute breaks normally allowed"; that is, "the person would need ten minutes or more added onto any or all breaks on at least an occasional basis." (A.R. 562.)

In short, the Court cannot assume that regular "normal break schedule" and "mid-shift" breaks allow "ready access to a restroom." Without a clearer explanation, the Court cannot conclude that the ALJ complied with the remand order.

Additionally, the Court notes that some of the evidence the ALJ cites in support of his conclusion with respect to Plaintiff's urinary incontinence is

incomplete.  For example, the ALJ cites a medical record from May of 2012 indicating that the Plaintiff had "done quite well" with a particular treatment for her incontinence.  (A.R. 495 (citing A.R. 997).)  The particular record does, in fact, state that Plaintiff "has done quite well" with the treatment identified by the ALJ.  (A.R. 997.)  The record also states, however, that "[Plaintiff's] present problem is that she is having urinary urgency, frequency, dysuria with increasing frequency that has gotten worse over the past week."  (A.R. 997)  Accordingly, even if Plaintiff had "done quite well" with the treatment, the issues clearly had not resolved as of the date of that record, and the difference between improvement and resolution is precisely the distinction the Ninth Circuit made in its remand order.

Next, the ALJ wrote that "[d]uring her testimony, the claimant described that she has about one accident per day."  (A.R. 495.)  What Plaintiff actually testified is that she has an accident "[o]n average, *at least* once a day."  (A.R. 531 (emphasis added).)  She testified also that her accidents are severe enough to require her to change clothes "two to three times a week."  (A.R. 531)  The ALJ did not cite to any evidence that would contradict Plaintiff's testimony on this point.

Ultimately, the ambiguity surround the allowable break schedule, and the ALJ's incomplete consideration of material evidence require remand.  It is not

clear whether the ALJ complied with the Ninth Circuit's order to either "show that McGee's urinary issues were fully controlled" or provide for "the limitation of needing ready access to a restroom at work."

**B.      The ALJ's Determination of Plaintiff's Credibility**

Plaintiff argues that the ALJ's credibility determination was erroneous because the ALJ made only a general credibility finding without providing clear and convincing reasons for rejecting her testimony.  The Commissioner counters that the ALJ properly evaluated Plaintiff's credibility.

The credibility of a claimant's testimony is analyzed in two steps.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  First, the ALJ must determine whether the claimant has presented objective evidence of an impairment or impairments that could reasonably be expected to produce the pain or other symptoms alleged.  *Id.*  Second, if the claimant meets the first step, and there is no affirmative evidence of malingering, the ALJ may reject the claimant's testimony only if she provides "specific, clear and convincing reasons" for doing so.  *Id.*  "In order for the ALJ to find [the claimant's] testimony unreliable, the ALJ must make 'a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony.'"  *Turner v. Commissioner of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 n.3 (9th Cir. 2010).

"General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Reddick*, 157 F.3d at 722 (quoting *Lester*, 81 F.3d at 834)). *See also Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015). The clear and convincing standard "is not an easy requirement to meet: '[It] is the most demanding required in Social Security cases.'" *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014).

To assess a claimant's credibility, the ALJ may consider (1) ordinary credibility techniques, such as the claimants reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek or follow treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. *Chaudry v. Astrue*, 688 F.3d 661, 672 (9th Cir. 2012); *Fair v. Bowen*, 885 F.2d 597, 603-04 (9th Cir. 1989). An ALJ may also take the lack of objective medical evidence into consideration when assessing credibility. *Baston v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004). However, the ALJ may not reject the claimant's statements about the intensity and persistence of their pain or other symptoms "solely because the available objective medical evidence does not substantiate [the claimant's] statements." 20 C.F.R. § 404.1529(c)(2).

Here, the first step of the credibility analysis is not at issue. The ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause her symptoms, and there is no argument that Plaintiff is malingering. Therefore, the ALJ was required to cite specific, clear and convincing reasons for rejecting Plaintiff's subjective testimony about the severity of her symptoms. The Court finds that he failed to so.

The ALJ did present clear and convincing reasons for discrediting some of Plaintiff's testimony regarding her physical limitations, including that she walked without difficulty at the hearing, had a normal gait, did not change positions at the hearing, and that she conducts daily activities inconsistent with her claimed symptoms. (A.R. 486, 495.) Notably, the reasons the ALJ cited regarding the lack of Plaintiff's credibility are very similar to the reasons cited in the last decision, which Judge Strong discussed, and which the Ninth Circuit affirmed. (A.R. 606-607.)

However, the ALJ failed to cite specific, clear, and convincing reasons for rejecting Plaintiff's testimony regarding her urinary incontinence. The ALJ made a general credibility finding that "claimants statements concerning the intensity, persistence and limiting effects of her symptoms" were "not entirely credible for the reasons set forth above and below." (A.R. 494.) But the ALJ does not mention

Plaintiff's credibility in the paragraph in which he discusses her incontinence. It is therefore impossible for the Court to determine whether he found her credible on this point. (A.R. 495.) For example, the ALJ does not discuss Plaintiff's testimony that her incontinence forces her to change clothes multiple times per week, and that she cannot recall a single time at her nanny job that she has not had to change clothes. If the ALJ found that testimony to be credible, it would not square with his determination that Plaintiff could perform a job where access to a restroom is limited to a normal break schedule. If the ALJ found that testimony not to be credible, he failed to provide specific, clear, and convincing reasons why.

In *Brown-Hunter*, 806 F.3d at 489, the Ninth Circuit held an ALJ fell short of providing specific, clear, and convincing reasons for rejecting a claimant's testimony by merely reciting the medical evidence in support of his RFC finding. The Court explained that summarizing the medical record "is not the same as providing clear and convincing *reasons* for finding the claimant's symptom testimony not credible." *Id.* at 494 (emphasis in original). The Ninth Circuit also emphasized that the ALJ must identify specifically *which* of the claimant's statements he found not credible and *which* evidence contradicted that testimony. *Id.* at 493-494.

Here, the ALJ presented, albeit incompletely, Plaintiff's medical records

surrounding her incontinence, but he failed to set out the specific "allegations in connection with her applications for disability" that he found not to be credible. (A.R. 495.) The most pertinent statement from the ALJ on this point is that Plaintiff had "done quite well" following her InterStim implant. From that, it might be inferred that the ALJ did not believe Plaintiff's statements about the extent to which her incontinence remains an issue. However, the Court is not permitted to make such inferences. *See Brown-Hunter*, 806 F.3d at 494 (explaining the district court may not draw inferences from the ALJ's summary of the medical record to find a basis for the adverse credibility determination where the ALJ did not himself draw those conclusions).

Without the required specificity, the Court cannot meaningfully review the ALJ's decision to determine whether the ALJ arbitrarily discredited Plaintiff's testimony. *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) ("[T]he ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."); *Brown-Hunter*, 806 F.3d at 492 ("[A]lthough we will not fault the agency merely for explaining its decision with 'less than ideal clarity,' . . . we still demand that the agency set forth the reasoning behind its decision in a way that allows for meaningful review.") (citation omitted).

Because the ALJ failed to point to the specific parts of Plaintiff's testimony he found not credible, and failed to link that testimony to particular parts of the record, the ALJ erred. *Brown-Hunter*, 806 F.3d at 494. *See also Mangat v. Colvin*, 2017 WL 1223881, *5 (S.D. Cal. Feb. 3, 2017) ("The ALJ failed to point to specific parts of Plaintiff's testimony he discredited. This error alone is fatal to the ALJ's credibility determination.").

As such, the Court finds that the ALJ's credibility finding is not supported by specific, clear, and convincing reasons with respect to Plaintiff's urinary incontinence.

### C.     The ALJ's Determination as to Plaintiff's Exertional Level

The ALJ determined that Plaintiff is capable of performing light work. (A.R. 494.) Plaintiff argues that determination was in error.

The Social Security regulations define "light work" as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967(b).  The ALJ discussed Plaintiff's medical limitations at length and provided substantial bases for his opinion that Plaintiff can perform light work, with the inclusion of certain specific restrictions.  (A.R. 494-497.)  Notably, though Plaintiff's medical records generally establish her persistent limitations, no acceptable medical source has put her on any activity restriction or opined that she is unable to work.[5]

The Court finds that the ALJ provided substantial evidence for his determination that Plaintiff is capable of performing light work.

### D.     The ALJ's Determination that Plaintiff Does Not Meet a Listing

The ALJ determined that Plaintiff does not have an impairment or combination of impairments that equals a listing.  Plaintiff argues that her cerebral palsy meets both a childhood and adult listing.

First, the Ninth Circuit has already affirmed that Plaintiff did not meet the requirements for a childhood listing.  (A.R. at 612.)  Since Plaintiff's original hearing post-dated her 18th birthday (and therefore any new information available to the ALJ on remand stems from Plaintiff's life as an adult), whether she met the criteria for a listing as a child is no longer at issue.  *See Hulsey*, 622 F.3d at 925

---

[5] Although the ALJ did not err in finding that Plaintiff is capable of performing light work, that finding is not sufficient to conclude that she is not disabled.  *See* 20 C.F.R. § 404.1569a (distinguishing exertional and nonexertional limitations).

(law of the case doctrine applies to administrative agencies on remand, including Social Security proceedings).

In order for Plaintiff to meet the listing criteria as an adult with respect to her cerebral palsy, she must exhibit "significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station." 20 C.F.R. § 404, Sub. P, App. 1. There is no dispute that Plaintiff suffers from significant and persistent disorganization of motor function in her right arm, and there also is no dispute that the left side of Plaintiff's body is without limitation. The question, then, is whether Plaintiff suffers from significant and persistent disorganization of motor function in her right leg.

The vast majority of the medical information that would seem to promote a finding of significant and persistent disorganization of motor function in Plaintiff's right leg is dated prior to her original hearing, and, as explained, the Ninth Circuit has already affirmed that Plaintiff did not qualify at that time. (*See* Doc. 10 at 20-22.) The only records Plaintiff cites that post-date her original hearing are two surgical procedures, and Plaintiff does not explain at all how these procedures should alter the ALJ's finding that Plaintiff did not meet a listing. (*Id*. at 21-22.) The ALJ found that Plaintiff "has excellent functioning in one hand and no

disturbance in her gait or station." (A.R. 494.) Plaintiff does not point to any medical records that would undermine that conclusion.

Accordingly, the Court finds that the ALJ provided substantial evidence for his determination that Plaintiff does not meet the adult listing for cerebral palsy.

### E.     The ALJ's Evaluation of the Treating Source Opinions

Plaintiff contends that the ALJ failed to give proper weight to the opinions of her treating physicians. In response, the Commissioner argues the ALJ properly considered the treating source evidence.

Opinions of treating physicians may only be rejected under certain criteria. *Lester,* 81 F.3d at 830. To discount an uncontradicted opinion of a treating physician, the ALJ must provide "clear and convincing reasons." *Id.* To discount the controverted opinion of a treating physician, the ALJ must provide "'specific and legitimate reasons' supported by substantial evidence in the record." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012)*; Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). The ALJ can accomplish this by setting forth "a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). "The ALJ must do more than offer his conclusions. He must

set forth his own interpretations and explain why they, rather than the doctors' are correct." *Reddick*, 157 F.3d at 725.

Frankly, it is difficult to discern exactly what Plaintiff's complaint is here. She writes that "[t]he ALJ has failed to provide an explanation for his decision to question both Plaintiff and her health care providers," but she does not cite to any opinion from any treating physician that the ALJ rejected. (Doc. 10 at 26.) The Court has not located any point in the ALJ's decision where it appears that he rejected the findings of any physician. The ALJ did reject the findings of Newcomer, a social worker, but, as the Court recognized prior to remand, Newcomer is not an acceptable medical source and cannot establish a disability. (A.R. at 608.) Plaintiff does not identify a single physician who has placed her on any sort of work restriction, so the ALJ has not rejected any medical opinion that Plaintiff cannot work. The ALJ seems to have credited every medical opinion provided to him and concluded, nevertheless, that Plaintiff is not disabled. He provided substantial basis for that conclusion.

### F.     The ALJ's Determination of Jobs Plaintiff Could Perform

Because the Court concludes that the ALJ failed to properly explain his findings with respect to Plaintiff's urinary incontinence, the Court need not reach Plaintiff's allegation that the ALJ erred in determining that there are jobs in the

national economy that Plaintiff can perform.  The extent to which Plaintiff's

incontinence may impact her ability to work is inextricably linked to the jobs that

Plaintiff could perform.  This issue therefore is moot due to the ALJ's errors with

respect to Plaintiff's incontinence.  On remand, the ALJ should incorporate any

changes in Plaintiff's RFC that arise from his analysis of that evidence.

## V.    REMAND OR REVERSAL FOR BENEFITS

Plaintiff asks the Court to reverse the decision and grant her benefits.  (Doc.

22 at 30.)  "[T]he decision whether to remand a case for additional evidence or

simply to award benefits is within the discretion of the court."  *Reddick*, 157 F.3d

at 728.  If the ALJ's decision "is not supported by the record, 'the proper course,

except in rare circumstances, is to remand to the agency for additional

investigation or explanation.'" *Hill v. Astrue*, 698 F.3d 1153, 1162 (9th Cir. 2012)

(quoting *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004)).  "If additional

proceedings can remedy defects in the original administrative proceedings, a social

security case should be remanded.  Where, however, a rehearing would simply

delay receipt of benefits, reversal [and an award of benefits] is appropriate."  *Lewin*

*v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981).

The Court finds remand for further proceedings is appropriate.  On remand,

the ALJ shall more clearly delineate Plaintiff's requirements with respect to

restroom access, especially including whether she requires ready access to a restroom, which the Court interprets as immediate access without regard to any routine, scheduled breaks. In addition, the ALJ shall explicitly consider Plaintiff's testimony regarding her urinary incontinence and provide specific, clear, and convincing reasons why that testimony should not be credited, if indeed that is his conclusion.

## VI.    CONCLUSION

For the foregoing reasons, the Court orders that the Commissioner's decision is **REVERSED** and this matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent herewith.

DATED this 19th day of March, 2018.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge